973 P.2d 1011 (1999)
137 Wash.2d 580
W.R. GRACE & CO.CONN.; and Chrysler Motors Corporation, Appellants,
v.
STATE of Washington, DEPARTMENT OF REVENUE, Respondent.
Buffelen Woodworking Company, et al., Appellants,
v.
State of Washington, Department of Revenue, Respondent.
Nos. 64335-1, 65608-8.
Supreme Court of Washington, En Banc.
Argued June 9, 1998.
Decided April 1, 1999.
*1012 Bogle & Gates, Donald Young, Bellevue, Scott Edwards, John Piper, Seattle, for Appellants.
Christine Gregoire, Attorney General, Donald F. Cofer, Asst., Olympia, for Respondent.
TALMADGE, J.
This is our sixth,[1] and hopefully final, decision in the recent round of cases on the constitutionality of Washington's Business and Occupation (B & O) tax on interstate manufacturers and sellers. Yet again, we are asked if the United States Supreme Court opinion in Tyler Pipe applies retroactively and, if so, what remedies are available to taxpayers who paid B & O taxes under the unconstitutional tax scheme identified by the United States Supreme Court in that decision, particularly for those periods prior to June 23, 1987, the date of the issuance of the Court's opinion. We are also asked to decide if the various taxpayers (taxpayers) in these *1013 cases have standing to request relief or whether their cases are barred under principles of issue/claim preclusion.
Our prior decisions resolve the core issues in these cases. The holding of the United States Supreme Court in Tyler Pipe applies retroactively. Similarly, the legislative remedy for the unconstitutionality of Washington's B & O tax system enacted in 1987[2] providing credits to those who paid the constitutionally defective tax applies retroactively as well. In light of our resolution of these issues, we do not reach the Department of Revenue's (DOR) standing or issue/claim preclusion issues, preserving those questions for trial court resolution on remand, as may be necessary.

ISSUES
1. Does Tyler Pipe apply retroactively?
2. Do taxpayers assert any viable grounds for revisiting the issue of the constitutionality of Washington's B & O tax scheme?

FACTS
The facts surrounding the constitutionality of Washington's B & O tax on interstate sales and manufacturing under the Commerce Clause of the United States Constitution have been amply discussed in our numerous prior opinions. We recount the specific facts of the taxpayers involved in these cases.
W.R. Grace (Grace) and Chrysler Corporation (Chrysler) were among a group of 71 taxpayers seeking refunds of B & O taxes in National Can I, claiming that the taxes they had paid violated the Commerce Clause. On June 23, 1987, the United States Supreme Court reversed in part and affirmed in part our decisions in Tyler Pipe and National Can I. Tyler Pipe Indus., Inc. v. Department of Revenue, 483 U.S. 232, 240, 107 S.Ct. 2810, 2816, 97 L.Ed.2d 199 (1987). The Court held that the "multiple activities exemption" in RCW 82.04.440 discriminated against interstate commerce, Tyler Pipe, 483 U.S. at 240-48, 107 S.Ct. 2810, but only partially invalidated the State's tax scheme, rejecting taxpayers' nexus and apportionment challenges to Washington's B & O tax, as we did. Id. at 248-51, 253, 107 S.Ct. 2810; cf. National Can I, 105 Wash.2d at 340-42, 732 P.2d 134; Tyler Pipe, 105 Wash.2d at 322-27, 715 P.2d 123; see also American Nat'l Can, 114 Wash.2d at 248, 787 P.2d 545. The Court remanded the case to us for resolution of the "remedial issues." Tyler Pipe, 483 U.S. at 253, 107 S.Ct. 2810. On remand, we held the Supreme Court's holding in Tyler Pipe applied prospectively only and denied the taxpayers like Grace and Chrysler any refunds for taxable activities before June 23, 1987, the date of the Supreme Court decision. National Can II, 109 Wash.2d at 895, 749 P.2d 1286. The United States Supreme Court dismissed the taxpayers' appeals from that decision. Tyler Pipe, 486 U.S. 1040, 108 S.Ct. 2030 (1988).
On August 11, 1987, Governor Booth Gardner signed a two-way credit law, the multiple activities tax credit (MATC), which was designed to eliminate the constitutional defects in Washington's B & O tax identified by the Supreme Court in Tyler Pipe. Laws of 1987, 2d Ex.Sess., ch. 3. Under the new law, all persons engaged in manufacturing activities in Washington must pay a manufacturing tax. All persons engaged in selling in Washington must pay a selling tax. Persons paying a selling tax may take a credit against that tax for any manufacturing tax paid to Washington or any other jurisdiction on the same product. In addition, persons paying a manufacturing tax and selling out-of-state can take a credit against that tax for any selling tax paid on the same product. Section 3 provided such credits were the exclusive remedy available to taxpayers in the event a court should deem relief appropriate regarding the former multiple activities exemption for any tax periods before the August 12, 1987 effective date of the law.[3]
*1014 Grace and Chrysler, along with many other taxpayers, next challenged the 1987 two-way credit law, as well as the retroactive application of the two-way credit to the seven-week "interim period" from June 23, 1987 through August 11, 1987, claiming the 1987 law "discriminates against interstate commerce, violates principles of equal protection, and violates their right to due process of law." American Nat'l Can, 114 Wash.2d at 241, 787 P.2d 545. In American Nat'l Can, we upheld the MATC and applied it retroactively to the interim period. We rejected the argument that because interstate taxpayers claimed only $1.3 million in credits between June 1987 and October 1988, the 1987 law had no practical effect. Id. at 240, 246-47, 787 P.2d 545.
In this most recent litigation, DOR imposed three final tax assessments against Grace, covering tax periods from January 1980 through December 1990, for unpaid taxes and interest. Grace filed a complaint in superior court for declaratory judgment, injunctive relief, and recovery of damages against the Governor, the Attorney General, the Director of DOR, and DOR, contending to the extent the defendants were seeking to collect B & O taxes for periods through June 23, 1987, the defendants were seeking to collect unconstitutional taxes in light of Tyler Pipe. Grace later voluntarily dismissed the three individual defendants. DOR answered, asserting affirmative defenses of issue preclusion based on Grace's involvement in National Can II and American Nat'l Can. DOR also pleaded a counterclaim for unpaid taxes, penalties, and interest.
Similarly, DOR assessed Chrysler for unpaid taxes and interest covering tax periods from January 1984 through June 1988. Chrysler timely filed an administrative appeal of the assessments, which under RCW 82.32.160 automatically prevented the assessments from becoming final until DOR acted on the appeal. While the administrative appeal was still pending, Chrysler filed a superior court action similar to Grace's seeking declaratory judgment, injunctive relief, and recovery of damages against the Attorney General, the Director, and DOR, and then subsequently withdrew its administrative appeal. Chrysler later filed an amended complaint seeking relief against DOR only, alleging Commerce Clause violations similar to those made by Grace. DOR again asserted issue preclusion based on Chrysler's participation in National Can II and American Nat'l Can, and sought unpaid taxes, interest and penalties by counterclaim.
All of the parties filed motions for partial summary judgment. DOR sought dismissal of all claims based on issue preclusion, while the taxpayers' motions sought application of Tyler Pipe retroactively from its June 23, 1987 release date, and invalidation of B & O taxes imposed before and after such date. The trial court issued detailed memorandum opinions in the two actions applying Tyler Pipe retroactively, upholding the constitutionality of the 1987 MATC legislation and applying it retroactively, and remanding the cases to DOR to recompute the taxpayers' assessments in order to retroactively apply the two-way credit found at RCW 82.04.440. The trial court denied DOR's motions as to issue preclusion. The parties moved for reconsideration with Grace and Chrysler specifically arguing no penalties should be imposed against them.[4] In the meanwhile, our Digital decision was issued. The trial court requested additional briefing on the effect of the Digital decision. The trial court ultimately denied the parties' motions for reconsideration, ruled no penalties would be included in DOR's money judgments against the taxpayers, but that interest may be assessed, and concluded Digital confirmed its earlier ruling that Tyler Pipe applied retroactively. The various parties' appeals are now before us.
In December 1984, Buffelen Woodworking Company (Buffelen) filed a complaint in Thurston County Superior Court for refund of B & O taxes paid since January 1980 in *1015 violation of the Commerce Clause. Buffelen's action was one of nearly 100 similar refund actions filed that month alone in Thurston County Superior Court. National Can I, 105 Wash.2d at 329, 732 P.2d 134. More than 300 similar refund actions were originally filed between 1984 and 1990. In December 1993, plaintiff taxpayers in 104 of the remaining refund actions moved to consolidate the actions. DOR opposed the motion, but the trial court granted consolidation of 103 of the cases under the Buffelen[5] caption.
The taxpayers in the consolidated actions filed a joint motion for partial summary judgment contending Tyler Pipe retroactively invalidated taxes paid by appellants prior to June 1987 and they were entitled to full refunds of any unconstitutional taxes they might have paid. DOR moved to strike certain evidence offered in support of the taxpayers' motion.
Relying on its ruling in Grace and Chrysler, the trial court entered orders similar to its orders in those cases ruling that Tyler Pipe should be applied retroactively, but that refunds for pre-Tyler Pipe tax periods would be limited to credits for gross receipts taxes the taxpayers paid to other jurisdictions.[6] Because the taxpayers waived any refund claims based on such credits, the trial court awarded no tax refunds to any of them. DOR filed motions for reconsideration in both cases, which were denied. Both the taxpayers and DOR appealed. We granted direct review. RAP 4.2(a)(4). For purposes of argument, Grace/Chrysler and Buffelen/Anheuser-Busch were treated as separate cases, but we resolve the issues in those cases in this single opinion.

ANALYSIS
As a preliminary matter, DOR has raised a number of procedural issues including standing, issue/claim preclusion, the propriety of the consolidation of cases in Buffelen, the designation of evidence relied upon in the summary judgment orders under CR 56(h)/ RAP 9.12, and the admissibility of the affidavit of John Piper, one of the taxpayers' attorneys.
In light of the sheer volume of cases confronting the trial court, we give significant latitude to its efforts to process the many cases before it. First, CR 42(a) confers substantial discretion on trial courts with respect to consolidation of common questions of law or fact. DOR has failed to demonstrate the trial court abused its discretion in consolidating the tax refund actions under the Buffelen Anheuser-Busch captions. Leader Nat'l Ins. Co. v. Torres, 51 Wash.App. 136, 142, 751 P.2d 1252 (1988) ("CR 42(a) allows a court to consolidate actions which involve a common question of law or fact. Consolidation is within the discretion of the trial court and will be reversed only upon a showing of abuse and that the moving party was prejudiced."), aff'd, 113 Wash.2d 366, 779 P.2d 722 (1989). We affirm the trial court's consolidation order in Buffelen as DOR demonstrates no abuse of discretion by the trial court. State v. Norby, 122 Wash.2d 258, 265, 858 P.2d 210 (1993) (trial court's ruling consolidating cases is reviewed under the abuse of discretion standard); Port of Seattle v. Equitable Capital Group, Inc., 127 Wash.2d 202, 213, 898 P.2d 275 (1995) (discretionary decision or order of the trial court will not be disturbed on review except on a clear showing of abuse, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons).
Second, with respect to the listing of evidence, DOR faults the summary judgment orders entered by the trial court in Buffelen and Anheuser-Busch because they do not include seven affidavits presented by DOR in *1016 the listing of evidence the trial court considered. However, because the trial court indicated it had indeed read six of the seven affidavits, and the affidavits are included in the record before us, DOR's assertion that CR 56(h) and RAP 9.12 require the listing of such evidence in the judgment is of no moment. Because the affidavits are included in the record on appeal, any error in failing to list the affidavits in the summary judgment order is harmless. State v. Jackson, 102 Wash.2d 689, 695, 689 P.2d 76 (1984) (an error, not of constitutional magnitude, is harmless if there is a reasonable probability that absent the error the result would have been the same).
Third, as to the Piper affidavit, the admissibility of evidence is within the discretion of the trial court. See State v. Brown, 132 Wash.2d 529, 571-72, 940 P.2d 546 (1997) (trial court's admission of evidence is reviewed for abuse of discretion), cert. denied, ___ U.S. ___, 118 S.Ct. 1192, 140 L.Ed.2d 322 (1998). DOR asserts the trial court erred in refusing to strike the affidavits of John T. Piper, arguing the information contained therein is irrelevant and inadmissible. It further asserts nearly half the materials attached to the Piper affidavit are exact copies of evidence the taxpayers presented in American Nat'l Can; and, because the affidavits were offered to support taxpayers' renewed discrimination challenge to the MATC, from which taxpayers are precluded from relitigating, the affidavits should have been stricken. As the trial court essentially found in DOR's favor on the issues the affidavit concerned (i.e., taxpayers' constitutional challenges to the MATC), we do not reach this issue. State v. Gentry, 125 Wash.2d 570, 616-17, 888 P.2d 1105, cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995) (purely academic discussions of moot issues are inappropriate).
Finally, the standing and issue/claim preclusion issues DOR raises are plainly the most significant and meritorious of its many procedural arguments. Grace and Chrysler were parties in both National Can I/Tyler Pipe and American Nat'l Can. The former case rejected taxpayers' apportionment argument and the latter case both noted the resolution of the apportionment claim in Tyler Pipe and rejected taxpayers' constitutional challenges to Washington's amended B & O tax scheme. See Tyler Pipe, 483 U.S. at 240, 248-53, 107 S.Ct. 2810; American Nat'l Can, 114 Wash.2d at 248-49, 787 P.2d 545.[7] Thus, with respect to many of the issues raised by the taxpayers, they may well have had their day in court on those issues, although the taxpayers assert that the United States Supreme Court jurisprudence on taxation and the Commerce Clause requires these issues to be re-examined.
DOR also contends a number of the plaintiff taxpayers in the Buffelen litigation failed to prove their standing to make the Commerce Clause challenges in those actions. We note, however, the trial court did not reach the standing issue because the substantive grounds upon which it ruled were dispositive of the case. Issues upon which the trial court has made no final determination are not ripe for review. Department of Ecology v. Acquavella, 131 Wash.2d 746, 759-60, 935 P.2d 595 (1997) (where the trial court made no finding whether an irrigation district had forfeited a portion of its water rights, that issue was not ripe for review).
To lay to rest, once and for all, any lingering uncertainty regarding the application of Tyler Pipe and the 1987 remedial legislation, we prefer to resolve the substantive issues of the constitutional defect in Washington's B & O tax system and remedies for such defect. We take this unusual step because of the unique circumstances of this case and the public importance of the issues here, and do not intend this exceptional approach to become the rule on review. Schmidt v. Corner-stone Invs., Inc., 115 Wash.2d 148, 165-66, 795 P.2d 1143 (1990) (a reviewing court is not obliged to decide all the issues raised by the parties, but only those which are determinative). With respect to any issues of issue/claim preclusion and standing affecting individual parties, DOR's right to raise them *1017 to the trial court, if necessary, is fully preserved.[8]
A. Tyler Pipe Applies Retroactively
DOR argues Tyler Pipe's invalidation on commerce clause grounds of former RCW 82.04.440, exempting in-state manufacturers of goods sold in this state but not other manufacturers, does not apply retroactively to tax periods prior to June 23, 1987. We have already ruled on this issue, however, in Digital, holding the Tyler Pipe decision to apply retroactively.
Although we issued three opinions in Digital, we held Tyler Pipe applies retroactively. As we recently held in Davidson v. Hensen, 135 Wash.2d 112, 128, 954 P.2d 1327 (1998), "[w]here there is no majority agreement as to the rationale for a decision, the holding of the court is the position taken by those concurring on the narrowest grounds." While expressing different reasoning for their conclusions, five members of this Court, in the lead and concurring opinions, indicated Tyler Pipe applies retroactively. Digital Equip. Corp. v. Department of Revenue, 129 Wash.2d 177, 188, 916 P.2d 933 ( "To the extent our decision in National Can II holds that Tyler Pipe applies only on a prospective basis, we overrule it." (Smith, J., majority op.); "Tyler Pipe must be applied retroactively to tax periods predating its pronouncement[.]" Id. at 194, 916 P.2d 933. See also id. at 195, 916 P.2d 933, Durham, C.J., concurring opinion, agreeing with the majority's decision to overrule National Can II's determination Tyler Pipe would apply only prospectively, and clearly concluding "I would hold that ... Tyler Pipe applies retroactively...." Id. at 205, 916 P.2d 933.) The fivemember decision in Digital is controlling on the issue of retroactivity. On principles of stare decisis, we affirm the trial court's decision on this issue.[9]
B. Remedy for Washington's Constitutionally Defective B & O Tax
The taxpayers assert Washington's B & O tax is a nullity and they do not have to pay any B & O taxes whatsoever. They renew certain commerce clause challenges to application of the 1987 MATC credit, alleging the credit discriminates against interstate commerce and fails to properly apportion the B & O tax to interstate and intrastate activities of taxpayers. They also assert the MATC credit offends due process as both a "bait and switch" tactic forbidden by the United States Constitution, and by reaching too far back in time.
1. Washington's B & O Tax Scheme is Not a Nullity
The taxpayers argue the United States Supreme Court's decision in Tyler Pipe rendered that tax a nullity, totally void from its inception, and incapable of being cured by any legislative amendment. Therefore, they argue, they do not have to pay any B & O taxes whatsoever. They rely on antiquated Supreme Court authority, Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 1125, 30 L.Ed. 178 (1886),[10] and our statement *1018 in Boeing Co. v. State, 74 Wash.2d 82, 88-89, 442 P.2d 970 (1968) of the general rule that an invalid statute is a nullity. However, controlling law on this issue is found in a more recent United States Supreme Court precedent, which we have specifically adopted.
In McKesson Corp. v. Division of Alcoholic Beverages & Tobacco, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), the United States Supreme Court recognized where a State imposes an unconstitutional tax that is not beyond the power of the legislature to impose or does not fall on persons immune from taxation, the state legislature may modify the offending statute retroactively to correct the constitutional defect. In McKesson, the Court struck down a Florida liquor tax statute which favored in-state products. However, the Court did not treat the statute as a nullity:
a State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination. Florida may reformulate and enforce the Liquor Tax during the contested tax period in any way that treats petitioner and its competitors in a manner consistent with the dictates of the Commerce Clause. Having done so, the State may retain the tax appropriately levied upon petitioner pursuant to this reformulated scheme because this retention would deprive petitioner of its property pursuant to a tax scheme that is valid under the Commerce Clause.
McKesson, 496 U.S. at 39-40, 110 S.Ct. 2238. Similarly, in Associated Indus. v. Lohman, 511 U.S. 641, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994), the Court stated:
That we have declared the tax scheme impermissibly discriminatory in some localities does not in itself dictate the relief that the State must provide. As we noted in McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation, 496 U.S. 18, 39-40[, 110 S.Ct. 2238, 2252, 110 L.Ed.2d 17] (1990), a "State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination." ... [T]he Due Process Clause would demand only that, "to cure the illegality of the tax as originally imposed, the State must ultimately collect a tax for the contested tax period that in no respect impermissibly discriminates against interstate commerce." Id., at 44, n. 27[, 110 S.Ct. at 2254 n. 27]. The methods best adapted to achieving equal treatment in this case, whether partial or complete refunds or other measures, are similarly matters properly left for determination on remand.
Lohman, 511 U.S. at 656, 114 S.Ct. 1815. See also Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 755, 115 S.Ct. 1745, 1750, 131 L.Ed.2d 820 (1995) (citing McKesson, noting the "special circumstances" of tax cases involving a particular kind of constitutional violation, a discriminatory tax, which the State may cure without repaying back taxes).
In American Nat'l Can we acknowledged the dual purpose of the 1987 curative legislation to both establish parity among taxpayers and preserve the integrity of the B & O tax system, finding the new tax law constitutional. American Nat'l Can, at 247-49, 787 P.2d 545. We specifically adopted the McKesson analysis in Digital, at 189-91, 916 P.2d 933, holding the 1987 legislation cured any constitutional defect in Washington's B & O tax. We adhere again to those rulings: Washington's B & O tax is not a nullity because of the defects identified in Tyler Pipe where the 1987 remedial legislation cures such constitutional defects.
2. Taxpayers Commerce Clause Arguments Are Meritless
Taxpayers assert Washington's B & O tax, including the curative 1987 MATC, and that provision's reporting requirements, discriminates against interstate commerce. They also claim "[a]pportionment is the only permanent cure for the discrimination manifest in Washington's B & O Tax." G. Appellants' Br. at 41, B. Appellants' Br. at 31.
*1019 We put to rest taxpayers' discrimination and other constitutional challenges in American Nat'l Can, holding the 1987 MATC does not discriminate against interstate commerce, nor does it offend the requirements of equal protection or due process in curing any constitutional defects in Washington's B & O tax. Id. at 248-53, 787 P.2d 545. We also acknowledged the apportionment issue has been settled.
A long line of precedent has held that Washington's B & O tax meets the fair apportionment test. [Citations omitted.] This court ruled that the B & O tax without the 2-way credit posed no apportionment problem in National Can Corp. v. Department of Rev., 105 Wash.2d 327, 340-42, 732 P.2d 134 (1986). The Supreme Court did not disagree. Indeed, it rejected Tyler's fair apportionment challenge to the wholesale tax. Tyler, 483 U.S. at 253, 107 S.Ct. at 2823.
American Nat'l Can, 114 Wash.2d at 248, 787 P.2d 545. See also Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 100-02, 113 S.Ct. 2510, 2519-20, 125 L.Ed.2d 74 (1993) (state may craft a remedy in response to determination that it has imposed a tax that discriminates against interstate commerce).
Taxpayers ask us to ignore our own and the United States Supreme Court's rulings and revisit the apportionment issue. Relying on a law review article criticizing the Supreme Court's approach in several cases,[11] including Tyler Pipe, as inconsistent with Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995), the taxpayers urge us to seize this opportunity to apply Jefferson Lines and correct what they see as a misconceived analogy between the retail sales tax and gross receipts taxes.
We believe the taxpayers reliance on Jefferson Lines is misplaced. Nothing in that case purports to overturn or limit Tyler Pipe, including Tyler Pipe's rejection of an apportionment challenge to Washington's B & O tax. Noting that Tyler Pipe struck down Washington's gross receipts wholesaling tax exempting in-state, but not out-of-state, manufacturers, the United States Supreme Court went on to explain:
Although we have not held that a State imposing an apportioned gross receipts tax that grants a credit for sales taxes paid in-state must also extend such a credit to sales taxes paid out-of-state, we have noted that equality of treatment of interstate and intrastate activity has been the common theme among the paired (or "compensating") tax schemes that have passed constitutional muster. We have indeed never upheld a tax in the face of a substantiated charge that it provided credits for the taxpayer's payment of in-state taxes but failed to extend such credit to payment of equivalent out-of-state taxes. To the contrary, in upholding tax schemes providing credits for taxes paid in-state and occasioned by the same transaction, we have often pointed to the concomitant credit provisions for taxes paid out of state as supporting our conclusion that a particular tax passed muster because it treated out-of-state and in-state taxpayers alike. A general requirement of equal treatment is thus amply clear from our precedent We express no opinion on the need for equal treatment when a credit is allowed for payment of in-or out-of-state taxes by a third party.
Jefferson Lines, 514 U.S. at 192 n. 6, 115 S.Ct. 1331 (citations omitted). The taxpayers' premise that Jefferson Lines implicitly struck down or limited Tyler Pipe is inaccurate. Jefferson Lines also approves a credit for taxes paid out-of-state as provided by the MATC. We believe the guidelines enunciated by the United States Supreme Court in McKesson remain the applicable law here. We adhere again to our rulings in American Nat'l Can and Digital which comport with McKesson. The 1987 MATC cures the unconstitutional impact of Washington's B & O tax on interstate commerce identified by the United States Supreme Court in Tyler Pipe.
3. Application of the 1987 MATC Does Not Offend Due Process
The taxpayers also assert because the B & O tax was found unconstitutional in *1020 Tyler Pipe, anything less than either the enjoining of the collection of taxes pursuant to RCW 82.32.150, or the full refund of taxes paid, amounts to a "bait and switch" which offends due process principles. They contend that the exclusive remedy feature of the 1987 remedial legislation deprives them of the statutory opportunity to enjoin collection of the unconstitutional tax, or have such taxes refunded. But the authority they cite, Newsweek, Inc. v. Florida Dep't of Revenue, 522 U.S. 442, 118 S.Ct. 904, 139 L.Ed.2d 888 (1998) does not appear to advance their position.
Newsweek (citing Reich v. Collins, 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994)), holds that where Florida law provided a taxpayer with a choice of either prepayment or postpayment challenges to an assessed tax, it violated due process to deprive a taxpayer of the postpayment challenge option where he had paid the assessed taxes while reasonably relying on the availability of such option. The taxpayers here have not been deprived of the opportunity to challenge the Washington B & O tax scheme, as the taxpayers' many appearances before us challenging Washington's B & O tax attest. See also McKesson, 496 U.S. at 40, 110 S.Ct. at 2252 ("In the end, the State's postdeprivation procedure would provide petitioner with all of the process it is due: an opportunity to contest the validity of the tax and a `clear and certain remedy' designed to render the opportunity meaningful by preventing any permanent unlawful deprivation of property."). The taxpayers have a right to challenge the imposition of an unconstitutional tax and such a right is preserved both in prepayment or postpayment settings. As we previously determined, credits provided in the 1987 remedial statute are the appropriate remedy in this instance.[12]
We have specifically rejected taxpayers' argument that "the 1987 credit law, as an exclusive remedy, does not meet the requirements of federal due process." Digital, 129 Wash.2d at 189, 190, 916 P.2d 933. Moreover, it is difficult to envision that the taxpayers "bait and switch" argument carries any strength when the United States Supreme Court specifically approved the credit remedy set forth in the 1987 remedial legislation. Tyler Pipe, 483 U.S. at 249, 107 S.Ct. 2810. See also McKesson, 496 U.S. at 39-40, 110 S.Ct. 2238. Harper, 509 U.S. at 100-01, 113 S.Ct. 2510 (noting federal law does not necessarily mandate refund of a tax found to be impermissibly discriminatory, and that states retain flexibility to craft a remedy which satisfies federal due process).
We next turn to the question of the retroactive application of the 1987 remedial legislation. The trial court here held the 1987 curative legislation applied retroactively and cured any defects in the Washington B & O tax. The taxpayers argue retroactive application of the 1987 curative legislation offends due process because it reaches back too far in time, citing Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938) (approving a two year retroactive application of a tax statute); State v. Pacific Tel. & Tel. Co., 9 Wash.2d 11, 17, 113 P.2d 542, 545 (1941) (striking a four year period of tax statute retroactivity); and United States v. Carlton, 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (approving a slightly greater than one year retroactive application of a tax statute).
We have already decided this issue as well. In American Nat'l Can, we applied the 1987 legislation retroactively to the so-called interim period of June 23, 1987, the date of the Tyler Pipe decision, to August 11, 1987, the effective date of the 1987 legislation. American Nat'l Can, 114 Wash.2d at 253, 787 P.2d 545. In Digital, we went an additional step and rejected a due process challenge to the 1987 curative legislation, denying Digital's *1021 request for a refund of B & O taxes paid between January 1, 1983, and August 11, 1987, in effect applying the 1987 legislation retroactively for a period of some four and a half years. We stated:
Retroactive application of the 1987 credit law, designed to cure the constitutional infirmities of the B & O tax exemption scheme, satisfies the requirements of federal due process as a postdeprivation remedy. By providing manufacturers with tax credits for unconstitutional taxes paid, a clear and certain remedy is provided which cures the unconstitutional deprivation by equalizing the tax disparity between those manufacturers and manufacturers who were not subjected to the unconstitutional B & O taxes.
Digital, 129 Wash.2d at 194-95, 916 P.2d 933.[13] Our Digital decision on retroactivity is consistent with the legislative intent expressed in § 3 of the 1987 act to apply the MATC retroactively, if necessary, to cure any problems with Washington's B & O tax. Laws of 1987, 2d Ex.Sess., ch. 3, § 3.
Our holding in Digital finds support in federal case law. In Welch, the United States Supreme Court upheld retroactive application of a 1935 Wisconsin income tax on dividends received in 1933, relying on well established precedent holding "a tax is not necessarily unconstitutional because retroactive[,]" 305 U.S. at 146, 59 S.Ct. 121, and noting similar contexts in which due process challenges to tax statutes had been rejected. 305 U.S. at 149, 59 S.Ct. 121.
In Temple University v. United States, 769 F.2d 126 (3d Cir.1985), cert. denied, 476 U.S. 1182, 106 S.Ct. 2914, 91 L.Ed.2d 544 (1986), the Third Circuit relied on Welch in rejecting taxpayers due process challenge to 1984 curative legislation which cut off taxpayers claim for FICA tax refunds reaching back to 1979. The Third Circuit held (1) Congress may, without violating the due process clause, enact legislation having retroactive application if it is justified by a rational legislative purpose, (2) when such legislation is "curative" in character the retroactive application is entitled to be liberally construed, and (3) courts afford greater tolerance toward retroactive application of laws which coincide with long-standing public policy. Id. at 134, 59 S.Ct. 121.
In reaching its conclusion the Third Circuit discussed the implications of Welch, disagreeing with some state courts which applied Welch narrowly in declaring unconstitutional tax statutes which reached back in time more than one year prior to the statute's enactment Noting the Supreme Court has never actually prohibited such retroactivity, the Third Circuit found compelling the flexible standard provided in Welch, coupled with the fact the Supreme Court had spoken only in general terms, permitting an income tax statute to be retroactively applied to "recent transactions," and no federal court of appeals had yet adopted an absolute temporal limitation on retroactivity.
We find some guidance in the rather flexible criteria delineated by the Court in Welch v. Henry: "In each case it is necessary to consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation." 305 U.S. at 147, 59 S.Ct. at 126. The federal courts have generally interpreted these criteria as indicating that "[r]etroactive operation is constitutional where it is not harsh, arbitrary or unfair." An amplification of this principle is provided by an earlier case:
The decisive test in this instance is whether this taxpayer has had its expectations as to taxation unreasonably disappointed.... [R]etroactive taxation is not so arbitrary and oppressive as to be unconstitutional if it is no more burdensome than the taxpayer should have expected it to be when he did the thing which created the tax liability.... And when it is not, whether the period of *1022 retroactivity is comparatively long or short is of little consequence provided it isn't too long to be within reason.
Temple, 769 F.2d at 135 (alteration in original) (citations and footnotes omitted). As in Temple, it cannot be said taxpayers here have had their "expectations as to taxation unreasonably disappointed," or retroactive application of the 1987 curative credit, designed to benefit taxpayers, has made their tax liability more burdensome.
In Carlton, the Supreme Court again emphasized retroactive tax legislation has been repeatedly upheld against a due process challenge, 512 U.S. at 30, 114 S.Ct. 2018, and explained the key inquiry as follows:
Some ... decisions have stated that the validity of a retroactive tax provision under the Due Process Clause depends upon whether "retroactive application is so harsh and oppressive as to transgress the constitutional limitation." The "harsh and oppressive" formulation, however, "does not differ from the prohibition against arbitrary and irrational legislation" that applies generally to enactments in the sphere of economic policy. The due process standard to be applied to tax statutes with retroactive effect, therefore, is the same as that generally applicable to retroactive economic legislation:
"Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches....
"To be sure, ... retroactive legislation does have to meet a burden not faced by legislation that has only future effects.... "The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former'.... But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose."
Carlton, 512 U.S. at 30-31, 114 S.Ct. 2018 (citations omitted) (emphasis added). We have previously approved the motives of the legislature as proper in enacting the 1987 credit law to establish parity among taxpayers. American Nat'l Can, 114 Wash.2d at 248, 787 P.2d 545. Thus, the rational legislative purpose which Carlton requires is present.
The United States Supreme Court has not set a specific duration to the retroactive effect of tax legislation, preferring to rely on legislative decisions in this context. We adhere to our prior rulings in American Nat'l Can and Digital: retroactive application of the 1987 remedial legislation is called for by the statute and does not offend constitutional principles.

CONCLUSION
The time has come for this litigation to end. More than a decade ago in Tyler Pipe, the United States Supreme Court found Washington's B & O tax, as it applies to interstate sales and manufacturing, to offend the Commerce Clause. The Tyler Pipe decision applies retroactively.
Within two months of the Tyler Pipe decision the Legislature responded by enacting remedial legislation. That 1987 MATC legislation addressed the constitutional defects in a fashion specifically suggested by the United States Supreme Court itself. We reject here, as we have done previously, the taxpayers' commerce clause and due process challenges to the MATC. As cured by the MATC, Washington's B & O tax on interstate sales and manufacturing is not a nullity. The taxpayers' relief is limited to MATC credits. Thus, we apply the 1987 curative legislation retroactively. Such a retroactive application comports with the statutory directive and does not offend due process principles.
We affirm the trial court judgments on these key points and remand the cases to the trial court for further action consistent with this opinion.
GUY, C.J., and DURHAM, SMITH, JOHNSON, ALEXANDER, JJ., and DOLLIVER, J.P.T., concur.
*1023 SANDERS, J. (dissenting).
While the majority asserts "[t]he time has come for this litigation to end" (Majority at 1022), the time this matter should end is the time our state respects the constitutional rights[1] of its taxpayers and the time this court provides an adequate remedy for those whose rights have been violated. Unfortunately, that time has yet to come.
At their core the facts are relatively simple: we have an unapportioned business and occupation tax on gross receipts which, at least prior to the effective date of its amendment on August 11, 1987, violated the interstate commerce clause. Quite understandably the government wants to keep the moneys collected from this unconstitutional tax; in fact it wants to collect even more! Less understandably this court will not put a stop to it.
The question may be divided into two parts: the appropriate remedy due interstate taxpayers for preamendment taxes alleged due but unpaid and/or actually paid; and whether the 1987 amendment effectively cured the commerce clause deficiency so as to eliminate the necessity to provide a remedy for post-1987 tax periods.
I submit proper resolution of this case depends entirely on the nature and effect of the 1987 amendatory act[2] (hereinafter "1987 act"), for existing state statutes clearly provide (1) the State may not lawfully require payment of an unconstitutional tax;[3] (2) collection of an unconstitutional tax may be enjoined;[4] and (3) unconstitutional taxes actually paid must be refunded.[5]
*1024 I fundamentally differ with my colleagues in a number of respects:
First, the multiple activities tax credit provision in the 1987 act does not establish any obligation to pay any portion of the unconstitutional tax against which the credit may apply. Second, the 1987 act is prospectively effective from August 11, 1987, not retroactive to the beginning of time. Notwithstanding the expressed legislative intention set forth in section 3 of the 1987 act to restrict taxpayer remedies for prior tax periods to credits only, section 3 does not retroactively amend the substance of the preexisting B & 0 tax. Therefore the constitutional deficiency is not retroactively curedeven if we assume a retroactive amendment could ever resurrect an unconstitutional statute.
Third, this legislative effort to deny taxpayers their clearly defined preexisting statutory remedies against payment or refund of an unconstitutional tax deprives those taxpayers their property absent that process due by not only denying them a "clear and certain remedy" for the deprivation but also employing an unconstitutional "bait and switch" tactic.
Fourth, the 1987 act's tax credit scheme unconstitutionally discriminates against interstate commerce because tax credits for interstate business are nearly impossible to prove in practice; and the imposition of such a burden of proof, which depends on the tax laws of other states, is unconstitutional in theory.
Fifth, the Washington B & O tax, a tax on gross receipts, violates the commerce clause on its face because it is not apportioned to in-state value-producing activity, but taxes outof-state activity as well.
Assuming even one of the aforementioned disagreements with the majority is well founded in fact and law, these taxpayers are entitled to the full measure of the relief they request, not a farthing less.

I.
Statutory availability of tax credits does not defeat defense to underlying tax obligation, nor establish obligation to pay an unconstitutional tax
Section 3 of the amendatory act provides:
If it is determined by a court of competent jurisdiction, in a judgment not subject to review, that relief is appropriate for any tax reporting periods before the effective date of this act, in respect to RCW 82.04.440 as it existed before the effective date of this act, it is the intent of the legislature that the credits provided in RCW 82.04.440 as amended by section 2 of this act shall be applied to such reporting periods and that relief for such periods be limited to the granting of such credits.
Laws of 1987, 2d Ex.Sess., ch. 3, § 3 (emphasis added).
Section 3's reference to "the credits provided in RCW 82.04.440 as amended by section 2 of this act" is a scheme of multiple activities tax credits (MATC) whereby interstate taxpayers may credit qualifying taxes paid in other jurisdictions against their Washington B & O tax obligation, provided: "The amount of the credit shall *1025 not exceed the tax liability arising under this chapter with respect to the sale ... manufacturing... [or] extraction ... of those products." RCW 82.04.440(2), (3), (4). This statute implements a garden variety tax credit scheme where it is first necessary to establish and compute the tax liability before that liability can be reduced by setting off available credits.[6]
Plainly section 3 of the 1987 act is not inconsistent on its face with the assertion by interstate taxpayers that there are no taxes lawfully due for the pre-August 11, 1987 tax periods, regardless whether these taxpayers are entitled to apply any statutory tax credits. Axiomatically if no taxes are due for any tax period in question proceedings to establish or contest the availability of a credit against a $0 tax obligation are a waste of time for all concerned.
I posit there is indeed no such tax obligation because (1) the 1987 preamendment tax was found unconstitutional in Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987); (2) Tyler Pipe, as concedes the majority, applies retroactively (Majority at 1017);[7] (3) the 1987 act does not retroactively amend the substance of preexisting tax law; and (4) any unconstitutional statute, including a taxing statute, is invalid.
The first two points are self-evident and/or conceded by the majority. The third point will be discussed in the next section. I would have assumed the fourth point is also self-evident but for the fact the majority has engaged in such a complex analysis to reach a result favorable to the state tax collector. Therefore let us repair to those fundamentals of statutory invalidity to test the majority's conclusion that one may be compelled to pay an unconstitutional tax.
It was no less than Chief Justice John Marshall who observed, "[A]n act of the legislature, repugnant to the constitution, is void." Marbury v. Madison, 5 U.S. 137, 176, 1 Cranch 137, 2 L.Ed. 60 (1803). Were it necessary to find further justification for the Chief Justice, Alexander Hamilton provided exactly that in Federalist No. 78 wherein he opined, prior to the ratification of our national character:
No legislative act therefore contrary to the constitution can be valid. To deny this would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men acting by virtue of powers may do not only what their powers do not authorise, but what they forbid.
The Federalist No. 78 (Alexander Hamilton) (May 28, 1788), reprinted in THE FEDERALIST PAPERS BY ALEXANDER HAMILTON, JAMES MADISON, AND JOHN JAY 395-96 (Garry Wills ed., 1982).
Later judicial generations have also pledged their fidelity to this principle. In Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886), for example, the United States Supreme Court repeated
An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.
Id. at 442, 6 S.Ct. 1121. And our court is in accord. See, e.g., Drum v. University Place Water Dist., 144 Wash. 585, 258 P. 505 (1927), aff'd, 147 Wash. 699, 266 P. 1056 (1928); Boeing Co. v. State, 74 Wash.2d 82, *1026 88, 442 P.2d 970 (1968) ("It is the rule [under Washington law] that an invalid statute is a nullity. It is as inoperative as if it had never been passed."); City of Seattle v. Grundy, 86 Wash.2d 49, 50, 541 P.2d 994 (1975) ("A statute or ordinance which is void as being in conflict with a prohibition contained in the constitution is of no force and effect."). See also 16A Am.Jur.2d Constitutional Law § 203 (1998) ("[A]n unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed and never existed.") (footnotes omitted).
Notwithstanding this weighty authority in support of what lesser minds might conclude to be a simple truth, the majority responds that "controlling law on this issue is found in a more recent United States Supreme Court precedent." Majority at 1017 (citing McKesson Corp. v. Division of Alcoholic Beverages & Tobacco, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), as well as Associated Indus, v. Lohman, 511 U.S. 641, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994), and Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 755, 115 S.Ct. 1745, 1750, 131 L.Ed.2d 820 (1995)). However on closer inspection of this "more recent" authority it is apparent the United States Supreme Court has not turned its back on the Fathers but merely recognizes, under constitutionally limited circumstances, (1) a legislature may retroactively amend an otherwise unconstitutional statute so as to restore its validity during the effective period of the retroactive amendment; or (2) a decision declaring a new rule of law need not be retroactively applied.[8]
This then leads us to the next inquiry, i.e., does the 1987 act in fact retroactively amend preexisting law? For if it does not, we need not consider any possible constitutional objection to a retroactive scenario not presented. I venture this inquiry is summarily answered in the negative by the statute's text.

II.
Section 3 of 1987 amendment is a prospective attempt to limit preexisting remedies and does not retroactively cure the constitutional text
The majority, as well as previous decisions from this court, unfortunately use the term "retroactive" in relation to the 1987 act rather loosely by failing to distinguish between retroactive amendments to the substance of the tax vis-a-vis backward looking limitations on available remedies for prior tax periods.[9] On its face the 1987 act states its effective date shall be August 11, 1987.[10] Were the *1027 statute retroactive it would necessarily identify some prior effective date.[11] However here the legislature not only failed to do that, but affirmatively did exactly the opposite. Had the statute not identified its effective date as August 11, 1987 a judicial question might have been presented as to its effective date by default; however, even in that event the statute would have been judicially deemed prospective in accordance with overwhelming authority.[12]
This conclusion does not change by virtue of section 3 of the 1987 act, which in essence purports to limit judicial remedies to tax credits for prior tax periods; for this section is not on its face an expression of retroactivity but rather a prospective attempt to limit future remedies for prior events. Such does not make the statute "retroactive." See Landgraf v. USI Film Prods., 511 U.S. 244, 273, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("When the intervening *1028 statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive."). Therefore we must, at the outset, distinguish all claims of the majority which are premised upon retroactive tax statutes,[13] as this one isn't. Indeed it seems nearly the entire majority opinion builds upon this false premise.[14]

III.

Section 3 of the amendatory act is an unconstitutional "bait and switch" tactic which offends due process
Interstate taxpayers subject to B & O taxation before the effective date of the 1987 act, August 11, 1987, also challenge the constitutionality of section 3's legislative attempt to restrict the availability of their preexisting statutory right to either defend against collection of unconstitutional taxes or obtain a full cash refund of such taxes if already paid. Section 3 of the 1987 act is uncodified. It speaks to legislative "intent" yet does not purport to amend much less repeal preexisting statutes of general application which then, and now, provide clear and certain relief from unconstitutional taxation. See notes two, three, and four, supra.
These taxpayers object to any effort to limit their remedy to tax credits, asserting such limitation not only deprives the taxpayer of that "clear and certain remedy" which the constitution requires for coerced payment of unconstitutional taxes, McKesson, 496 U.S. at 32, 110 S.Ct. 2238, but also engages in unconstitutional "bait and switch" tactics depriving the taxpayer of a clearly established preexisting state remedy.
The essential constitutional flaw that lies at the heart of any attempt to retrospectively limit a taxpayer's remedy (to tax credits, for example) has been succinctly set out by the Supreme Court:
In a long line of cases, this Court has established that due process requires a "clear and certain" remedy for taxes collected in violation of federal law. A State has the flexibility to provide that remedy before the disputed taxes are paid (predeprivation), after they are paid (postdeprivation), or both. But what it may not do ... is hold out what plainly appears to be a "clear and certain" postdeprivation remedy and then declare, only after the disputed taxes have been paid, that no such remedy exists.
Reich v. Collins, 513 U.S. 106, 108, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994) (citations omitted). Although we held limitation of the postdeprivation remedy to tax credits satisfies due process in Digital Equipment (Digital Equip. Corp. v. Department of Revenue, 129 Wash.2d 177, 916 P.2d 933, cert. denied, 520 U.S. 1273, 117 S.Ct. 2452, 138 L.Ed.2d 210 (1997)) and Digital Equipment postdated Reich, Digital Equipment did not consider the "bait and switch" objection outlined in Reich nor even cite Reich to signal awareness of the contrary precedent.
Notwithstanding this contrary Supreme Court mandate the majority now blesses not only that which the Supreme Court has expressly condemned but what our court has condemned as well. In National Can Corp. v. Department of Revenue, 109 Wash.2d 878, 749 P.2d 1286 (1988) (National Can II) we held: "If the taxes were collected in violation of the constitution, then the state refund *1029 statutes would mandate refunds," refusing the refund only on the mistaken assumption Tyler Pipe was not to be applied retroactively. National Can II, 109 Wash.2d at 880-81, 749 P.2d 1286. Yet now the majority acknowledges Tyler Pipe applies retroactively (as we also held in Digital Equip., 129 Wash.2d at 188, 916 P.2d 933) yet ignores, without overruling, our previous holding that retroactive application of Tyler Pipe "mandate[s] refunds." National Can II, 109 Wash.2d at 881, 749 P.2d 1286. Consistency, therefore, is found only in the result which favors the tax collector, not the reasons which justify it.[15]
This case falls within the constitutional "bait and switch" prohibition because at all times material hereto every Washington taxpayer has enjoyed, and even now does enjoy, the statutory right to (1) simply lawfully refuse to pay an unconstitutional tax in the first place, RCW 82.04.4286; (2) seek an injunction against paying an unconstitutional tax, RCW 51.52.113; or (3) pay now and claim a refund later, RCW 82.32.060. Section 3's limitation of remedy is after the fact; it overlays these preexisting remedial statutes and clearly offends the "bait and switch" doctrine set forth in Reich and its progeny.
In Reich the Supreme Court considered a Georgia statute which, like RCW 82.32.060, provided a right to refund of taxes illegally paid, whether voluntary or not. Reich, 513 U.S. at 108-09, 115 S.Ct. 547 (citing Ga.Code Ann. § 48-2-35(a) (Supp.1994)). But Georgia courts attempted to defeat the preexisting remedy by claiming it did not apply to taxes collected pursuant to an unconstitutional statute. The Georgia Supreme Court therefore denied the statutory refund remedy, claiming due process was satisfied by an unutilized predeprivation process.
The Supreme Court acknowledged states have flexibility with respect to whether they will maintain an exclusively predeprivation remedial scheme, or an exclusively postdeprivation remedial scheme, or a hybrid regime, yet cautioned:
But what a State may not do, and what Georgia did here, is to reconfigure its scheme, unfairly, in mid-courseto "bait and switch," as some have described it. Specifically, in the mid-1980's, Georgia held out what plainly appeared to be a "clear and certain" postdeprivation remedy, in the form of its tax refund statute, and then declared, only after Reich and others had paid the disputed taxes, that no such remedy exists.
Reich, 513 U.S. at 111, 115 S.Ct. 547. Washington holds out exactly such a clear and certain remedy for the payment of an unconstitutional taxa refund, RCW 82.32.060 but the majority now seeks to deny the right of these taxpayers to exercise that statutory remedy.
Newsweek, Inc. v. Department of Revenue, 522 U.S. 442, 118 S.Ct. 904, 905, 139 L.Ed.2d 888 (1998) (per curiam) adds force to Reich. There considered was suit brought by Newsweek magazine against the Florida Department of Revenue seeking refund of sales taxes collected from Newsweek magazine between 1988 and 1990, contrary to the First Amendment of the United States Constitution. Newsweek claimed Florida's denial of the refund, notwithstanding a preexisting Florida refund statute analogous to Washington's, violated its due process right to relief as defined by McKesson v. Division of Alcoholic Beverages & Tobacco, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). The Florida trial court dismissed Newsweek's claim attempting to distinguish McKesson's requirement for "meaningful backward-looking relief based upon Florida law. Newsweek, Inc., 522 U.S. at 443, 118 S.Ct. 904 (citing McKesson, 496 U.S. at 31, 110 S.Ct. 2238). However, the Supreme Court summarily reversed based upon McKesson and Reich, holding that where state law holds out either a pre- or post-payment remedy during the tax period in question, due process requires the state to continue to offer the remedy and prevents the state from withdrawing that *1030 remedy after the fact which was available during the prior taxable period:
While Florida may be free to require taxpayers to litigate first and pay later, due process prevents it from applying this requirement to taxpayers, like Newsweek, who reasonably relied on the apparent availability of a postpayment refund when paying the tax.
Newsweek is entitled to a clear and certain remedy and thus it can use the refund procedures to adjudicate the merits of its claim.
Newsweek, Inc., 522 U.S. at 445, 118 S.Ct. 904.
But our majority rejects the "bait and switch" argument, asserting the Supreme Court has "specifically approved the credit remedy set forth in the 1987 remedial legislation" Majority at 1020 (emphasis in original) (citing Tyler Pipe, 483 U.S. at 249, 107 S.Ct. 2810). The majority's claim is fanciful since the Supreme Court in June of 1987 certainly had no occasion to "specifically approve" legislation passed nearly two months later! To the contrary, referenced dicta in Tyler Pipe deals not with a retroactive credit in lieu of preexisting statutory remedies but with prospective credits which might prospectively cure the commerce clause deficiency. Accord General Motors Corp. v. City & County of San Francisco, 69 Cal.App. 4th 448, 81 Cal.Rptr.2d 544, 549 (1999). This dicta is irrelevant on its face to the statutory right of a taxpayer to a refund of an unconstitutional tax actually paid, much less the obvious validity of a defense against paying an unconstitutional tax in the first place.[16]
The majority reasonsdespite the fact taxpayers had every reason to believe that they would be entitled to a refund or defense, as that is what our statutes promised them the taxpayers have not been the victims of duplicity because they still have the right to "challenge" Washington's B & O tax scheme in court. Majority at 1020. But what good is a challenge absent a remedy? Chief Justice John Marshall proclaimed in Marbury, "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury" and "One of the first duties of government is to afford that protection." Marbury v. Madison, 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803). Following up this observation the Chief Justice relied upon Lord Blackstone for the proposition "every right, when withheld, must have a remedy, and every injury its proper redress"; and then drew the circle to its close in language so plain even today's majority cannot hide from its mandate:
The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve the high appellation, if the. laws furnish no remedy for the violation of a vested right.
Marbury, 5 U.S. at 163.[17]
The majority's sophistry was most recently, and pointedly, rejected by the Supreme Court in Reich:
[T]the Georgia Supreme Court's reliance on Georgia's predeprivation procedures was entirely beside the point (and thus error), because even assuming the constitutional adequacy of these proceduresan issue on which we express no viewno reasonable taxpayer would have thought that they represented, in light of the apparent applicability of the refund statute, the exclusive remedy for unlawful taxes. *1031 Reich, 513 U.S. at 111, 115 S.Ct. 547. Accord Newsweek, Inc., 522 U.S. at 444, 118 S.Ct. 904. Surely, there is simply no reason taxpayers prior to enactment of the 1987 act would have thought that credit procedures which did not even then exist barred plain statutory remedies against collection of unconstitutional taxes![18]

IV.

The 1987 tax credit scheme itself unconstitutionally discriminates against interstate commerce
Ever mindful that "the power to tax is the power to destroy," we must be even more solicitous of the ratifiers' intent that interstate commerce be spared those burdens imposed by discriminatory state and local taxation.[19] "The Supreme Court has traditionally recognized that a large part of the rationale for granting Congress control over interstate commerce `was to [e]nsure ... against discriminating State legislation.'" Laurence H. Tribe, American Constitutional Law 453 (2d ed.1988) (citing Welton v. Missouri, 91 U.S. (1 Otto) 275, 280, 23 L.Ed. 347 (1875)).
"A State may not `impose a tax which discriminates against interstate commerce... by providing a direct commercial advantage to local business.'" Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 197, 115 S.Ct. 1331, 1344, 131 L.Ed.2d 261 (1995) (quoting Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421, 67 A.L.R.2d 1292 (1959)).
But this credit scheme discriminates against interstate commerce in both form and substance. First, section 3, as the majority construes it, requires interstate taxpayers seeking a remedy for prior unconstitutional taxation to prove, through a difficult, burdensome, if not impossible, procedure the quantum of foreign taxes actually paid as well as the technical intricacies of foreign taxation to qualify for a credit; whereas instate businesses are automatically credited the entire amount in the first instance. Second, it is a discriminatory scheme in itself which places the burden on the taxpayer to prove and quantify the specific taxes actually paid to other taxing jurisdictions to obtain the unlikely credit.

A.

Tax credits are discriminatorily more burdensome for interstate taxpayers to obtain than in-state taxpayers
As illustrated by the record in this very proceeding, the discriminatory nature of the tax credit scheme is borne out by the practical nonavailability of such credits to interstate business. In order for the interstate taxpayer to avail himself of the credit, it is necessary to produce voluminous factual documentation[20] from every other taxing jurisdiction *1032 in America for periods increasingly remote in time, without end. As a practical matter, such record-keeping is extremely difficult, even if the necessity for the records is known in advance, and nearly impossible if the requirement is imposed, as it is here, after the fact. See General Motors Corp., 81 Cal.Rptr.2d at 548.
This record demonstrates, for example, that such specific documentation may not have been maintained in the first instance in other taxing jurisdictions, or may have been lost or destroyed over the intervening years even if it had.[21] However the failure to originally make, or thereafter maintain, these records is fatal to any claim of the interstate taxpayer for a tax credit whereas an in-state taxpayer has an automatic credit. Thus, as a practical matter, the in-state taxpayer enjoys an automatic 100 percent credit whereas the interstate taxpayer is lucky to recoup 1 percent, if that.[22]
The discriminatory burden placed upon interstate taxpayers to obtain the benefits of a tax credit in excess of that burden placed upon in-state taxpayers is so readily apparent that the lesson is clear to anyone engaged in interstate business that the business is much better off to move in-state so as to claim a B & O credit to both manufacture and sell in-state rather than risk a doubtful and difficult-to-prove credit for performing one of those functions out-of-state. This record demonstrates the cumbersome, if not impossible, procedure to recoup taxes paid in other jurisdictions to offset duplicitous taxes paid by the interstate business under the discriminatory Washington B & O tax falls much more heavily on the shoulders of interstate businesses than on their in-state counterparts.
But even if the taxpayer could carry his burden to prove double taxation in fact, simply placing such a burden on his shoulders itself unconstitutionally discriminates against his commerce.

B.
Interstate taxpayers may not be constitutionally required to prove "specific interstate transactions were subjected to multiple taxation in order to advance claim of discrimination"[23]
There is also the prospect, if not likelihood, that actual taxes paid on business activity in other jurisdictions will not be specifically analogous to the technical intricacies of the Washington B & O tax, thus disqualifying the interstate taxpayer from claiming foreign taxes actually paid as a credit against a Washington tax bill. This is not because *1033 interstate businesses do not pay business taxes in other jurisdictions, but because those tax schemes differ in technical aspects from our own. This discriminatory feature cannot be constitutionally cured even in theory by putting the taxpayer to his proof of actual taxes paid in other jurisdictions; however, even if it could, the burden of this proof, in and of itself, discriminatorily falls on the commerce of the interstate taxpayer. See General Motors Corp., 81 Cal.Rptr.2d at 547-48.
While the in-state taxpayer has an automatic credit, the interstate taxpayer must not only prove that he actually paid business taxes in another jurisdiction but must also prove the exact analogy of the foreign tax law to our own in order to qualify. This was exactly the burden the state tax collector sought to be placed on the interstate taxpayer to prove his claim in Tyler Pipe that the statute was unconstitutional. But that argument was squarely rejected by the Supreme Court in no uncertain terms:
The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment.
Tyler Pipe, 483 U.S. at 242 n. 11, 107 S.Ct. 2810 (quoting Freeman v. Hewit, 329 U.S. 249, 256, 67 S.Ct. 274, 91 L.Ed. 265 (1946)); see also City of Winchester v. American Woodmark Corp., 252 Va. 98, 471 S.E.2d 495 (1996). However the tax credit scheme at issue here incorporates on its face exactly that discriminatory mechanism which the Supreme Court condemned in the very opinion which struck down the unconstitutional tax which this credit scheme was supposedly enacted to cure: it leaves interstate taxpayers to "the shifting incidence of the varying tax laws of the various states at a particular moment." In pegboard fashion, the vice is suppressed here, only to reappear there: the Supreme Court disclaims any burden on the taxpayer to show how he has been harmed in fact to prove the tax unconstitutional, yet now the state reimposes the same burden by conditioning relief on precisely that.

V.

The commerce clause requires apportionment of gross receipt taxes on interstate business
The final concern is the constitutionality of the gross receipts tax, amended or not, vis-avis the claim that it constitutionally must be apportioned, but is not.
Consistent with the jurisdictional requirements of the due process and commerce clauses, a state may levy a nondiscriminatory tax on an aspect of a multistate transaction otherwise wholly immune from taxation because interstate in character (such as gross receipts from an out-of-state sale made by a local corporation), if the method by which the tax is measured apportions the tax burden in conformity with a formula that rationally relates the amount of the tax to the fraction of interstate activity taking place within the taxing state. Because they seek to derive uniquely local bases for state taxation from otherwise interstate aspects of taxed transactions, apportionment formulas in theory prevent interstate commerce from being cumulatively burdened by repeated taxation of the same incident.[[24]]
Although we have previously approved the tax at issue here against claims of malapportionment in National Can Corp. v. Department of Revenue, 105 Wash.2d 327, 340-42, 732 P.2d 134 (1986), judgment vacated by Tyler Pipe, 483 U.S. 232, 107 S.Ct. 2810, (National Can I), and American Nat'l Can Corp. v. Department of Revenue, 114 Wash.2d 236, 239, 787 P.2d 545 (1990), such approval was in the context of a challenge that conceded the tax met the Supreme Court's apportionment requirement. Id. at 241, 787 P.2d 545. Moreover that holding is ultimately not in accordance with the requirements of the commerce clause viewed from a perspective more enlightened by recent Supreme Court precedent and the more vigorous advocacy of these parties than was *1034 the case in presentations leading to previous decisions.[25] We have recognized as fundamental our state commerce clause jurisprudence must yield to Supreme Court precedent rather than repeating our own errors. See Digital Equip. Corp., 129 Wash.2d 177, 916 P.2d 933. See also Tricon, Inc. v. King County, 60 Wash.2d 392, 394, 374 P.2d 174 (1962) ("The issue here involves the interpretation and application of the federal constitution and we are bound to follow the decisions of the Supreme Court of the United States, which have passed on this issue."); B.F. Goodrich Co. v. State, 38 Wash.2d 663, 676, 231 P.2d 325 (1951) ("It scarcely needs be said that, with respect to matters involving the Federal constitution, we, as an inferior tribunal, must follow the pronouncements of [the United States Supreme Court] no matter what our private views may be.").
Every state tax must pass a four-part test to comply with the dormant commerce clause. American Nat'l Can, 114 Wash.2d at 241, 787 P.2d 545 (citing Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977)). To comply, state taxation of interstate business must: (1) tax only interstate activities with a sufficient connection to the taxing state; (2) be fairly apportioned to the taxpayer's activities in the taxing state; (3) not discriminate against interstate commerce; and (4) be fairly related to the services provided by the state. Id.[26] The taxpayers in American Nat'l Can only raised a third prong discrimination challenge, id., but in point of law the Washington scheme of tax credits still does not solve the fair apportionment prong.
Central Greyhound Lines v. Mealey, 334 U.S. 653, 68 S.Ct. 1260, 92 L.Ed. 1633 (1948) controls.[27] It holds fair apportionment of gross receipt taxes is required to pass muster under the dormant commerce clause. The gross receipt tax there considered was nearly identical to that imposed here. New York taxed gross receipts of an interstate bus line traveling between points within the state, but over routes which utilized highways outside the state in Pennsylvania and New Jersey. The gross receipts of these bus tickets were taxed without apportionment (or limitation) to in-state activities.
The United States Supreme Court held these unapportioned gross receipts taxes violated the commerce clause because they were not apportioned to taxing only in-state segments of travel.
The unapportioned New York tax is indistinguishable from Washington's except for Washington's tax credit feature. However it is apparent from Central Greyhound Lines that allowance of a tax credit is no defense to a fair apportionment challenge as the Supreme Court there held the tax must be apportioned even if no out-of-state taxes are paid or credited against the domestic tax:
[E]ven if neither Pennsylvania nor New Jersey sought to tax their proportionate share of the revenue from this transportation, such abstention would not justify the taxing by New York of the entire revenue. *1035 Central Greyhound Lines, 334 U.S. at 663, 68 S.Ct. 1260 (citing Freeman v. Hewit, 329 U.S. 249, 256, 67 S.Ct. 274, 288, 91 L.Ed. 265 (1946)). By its very nature "an unapportioned gross receipts tax makes interstate transportation bear more than `a fair share of the cost of the local government whose protection it enjoys.'" Central Greyhound Lines, 334 U.S. at 663, 68 S.Ct. 1260 (quoting Freeman, 329 U.S. at 253, 67 S.Ct. 274). The vice is that "it lays `a direct burden upon every transaction in [interstate] commerce by withholding, for the use of the State, a part of every dollar received in such transactions.' " Central Greyhound Lines, 334 U.S. at 663, 68 S.Ct. 1260 (alterations in original) (quoting Crew Levick Co. v. Pennsylvania, 245 U.S. 292, 38 S.Ct. 126, 62 L.Ed. 295 (1917)).
Although Tyler Pipe seems to discount an apportionment challenge to Washington's gross receipts tax,[28] more recent Supreme Court authority has reinvigorated the vitality of Central Greyhound's gross receipt tax apportionment requirement, highlighting the critical distinction between gross receipts and sales tax, not their analogy.
As the Supreme Court explained, the apportionment prong of the Complete Auto Transit test is required to ensure a state taxes only its fair share of an interstate transaction. Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 184, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (quoting Goldberg v. Sweet, 488 U.S. 252, 260-61, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989)). The question is how to slice up the tax pie among the states in which the taxpayer's activities have contributed to taxable value. Oklahoma Tax Comm'n, 514 U.S. at 186, 115 S.Ct. 1331. The answer is to apportion the income among the states in which the activity has occurred, and allow taxation only of that portion attributable to activity within that state. Id.
Sales taxes do not fit within this formula and thus need not be apportioned because, the Supreme Court reasoned, a sale of goods is best viewed "as a discrete event facilitated by the laws and amenities of the place of sale, and the transaction itself does not readily reveal the extent to which completed or anticipated interstate activity affects the value on which a buyer is taxed." Oklahoma Tax Comm'n, 514 U.S. at 186, 115 S.Ct. 1331. What saves a sales tax from apportionment challenge is that it does not provide an opportunity for multiple taxation of the same activity, as the tax necessarily falls only once upon the buyer of the goods or services who is taxed on his purchase at a single location. Id. at 189-90, 115 S.Ct. 1331. However a tax upon gross receipts does require apportionment because multiple taxation is possible, as the origin of the taxable value may be extraterritorial. Id. (citing Central Greyhound Lines, 334 U.S. 653, 68 S.Ct. 1260).
*1036 Jefferson Lines thus represented a critical clarification of previous Supreme Court precedent on this issue. See Walter Hellerstein et al., Commerce Clause Restraints on State Taxation after Jefferson Lines, 51 Tax L.Rev. 47, 97-98 (1995); see also M & Assocs., Inc. v. City of Irondale, 723 So.2d 592, 596 (Ala.1998) and see City of Winchester v. American Woodmark Corp., 252 Va. 98, 471 S.E.2d 495 (1996). And it is this clarification which renders questionable the majority's reliance upon earlier Supreme Court cases,[29] not to speak of cases from our own court,[30] that dismissed apportionment challenges to Washington's B & O tax (Majority at 1019) by falsely analogizing nexus requirements to apportionment.[31]
The problem is Washington's current B & 0 tax scheme allows for double taxation by taxing manufacturing, extracting, or wholesaling activities within the state without apportioning, or limiting, the tax to that part of the receipts attributable to value produced in this state only. Credits provided by the 1987 amendments do not eliminate the apportionment problem because the tax still is based on value produced in other taxing jurisdictions. It therefore uniquely burdens interstate commerce.
That an apportionment deficiency may not be corrected by allowing interstate businesses to credit similar taxes paid in other jurisdictions also seems quite apparent from the Jefferson Lines decision. The fair apportionment requirement implicates concerns of external consistency which look
not to the logical consequences of cloning [the tax in other jurisdictions],[[32]] but to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State. *1037 Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331 (citations omitted). While a properly structured nondiscriminatory tax credit scheme might arguably satisfy concerns of internal consistency by diminishing, at least in theory, the prospect of double taxation, Jefferson Lines clarifies the external consistency requirement for gross receipt taxes can be satisfied only by proper apportionment, as was the rule in Central Greyhound, where the court held "taxation of an interstate bus line's gross receipts was constitutionally limited to that portion reflecting miles traveled within the taxing jurisdiction." Jefferson, 514 U.S. at 186, 115 S.Ct. 1331.
Moreover, as the Supreme court in Tyler Pipe specifically held: The facial unconstitutionality of Washington's gross receipts tax cannot be alleviated by examining the effect of legislation enacted by its sister States,
Tyler, 483 U.S. at 242, 107 S.Ct. 2810, as,
"[T]he immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment."
Tyler, 483 U.S. at 242 n. 11, 107 S.Ct. 2810 (quoting Armco, Inc., 467 U.S. at 645 n. 8, 104 S.Ct. 2620). But that is exactly the burden put on interstate commerce by this tax credit scheme which wholly depends for its utilization upon proof not only of quantification of the actual tax paid in other jurisdictions but proof of the technical subtleties of those divergent tax schemes as well.

VI.

Conclusion
Thus, the majority pays lip service to the commerce clause but does little to protect the freedom of interstate commerce and nothing to protect interstate taxpayers from the avaricious appetite of state taxing authorities which, even to this day, extort payment of unconstitutional taxes while overtly denying taxpayers their statutory defense to payment, as well as their statutory right to refund. The majority's resolution does much for the coffers of this state but much to the constitutional rights of its citizens.
Until these priorities are reversed, I dissent.
MADSEN, J., concurs.
NOTES
[1] Tyler Pipe Indus. Inc. v. Department of Revenue, 105 Wash.2d 318, 715 P.2d 123 (1986), rev'd, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987); National Can Corp. v. Department of Revenue, 105 Wash.2d 327, 732 P.2d 134 (1986) (National Can I), rev'd, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987); National Can Corp. v. Department of Revenue, 109 Wash.2d 878, 749 P.2d 1286, cert. denied, 486 U.S. 1040, 108 S.Ct. 2030, 100 L.Ed.2d 615 (1988) (National Can II); American Nat'l Can Corp. v. Department of Revenue, 114 Wash.2d 236, 787 P.2d 545, cert. denied, 498 U.S. 880, 111 S.Ct. 213, 112 L.Ed.2d 173 (1990) (American Nat'l Can); Digital Equip. Co. v. Department of Revenue, 129 Wash.2d 177, 916 P.2d 933 (1996), cert. denied, 520 U.S. 1273, 117 S.Ct. 2452, 138 L.Ed.2d 210 (1997) (Digital).
[2] Laws of 1987, 2d Ex.Sess., ch. 3.
[3] If it is determined by a court ... that relief is appropriate for any tax reporting periods before the effective date of this act, in respect to [the multiple activities exemption] as it existed before the effective date of this act, it is the intent of the legislature that the credits ... shall be applied... and that relief ... be limited to the granting of such credits.

Laws of 1987, 2d Ex.Sess., ch. 3, § 3.
[4] The taxpayers filed notices of appeal to this Court in July 1996, long before the trial court heard argument on the parties' respective motions for reconsideration. We consolidated the cases on appeal and stayed all appellate procedures until the trial court resolved the motions for reconsideration.
[5] By 1997, only 47 of the 103 actions remained, the rest having been dismissed by stipulation or by motion of DOR. The trial court later granted motions to bring three more pending actions, with a total of five plaintiffs, under the Buffelen caption.
[6] The trial court severed three plaintiffs, Anheuser-Busch, Inc., Apple Computer, Inc., and Herman Miller, Inc., allegedly with "place of sale claims," and consolidated their refund claims under the caption of Anheuser-Busch, Inc. v. State, No. 86-2-02675-1 (Thurston Co. Super. Ct. July 18, 1997). The court then entered summary judgments in Anheuser-Busch as well.
[7] Indeed, taxpayers in American Nat'l Can conceded Washington's B & O tax is fairly apportioned. American Nat'l Can, 114 Wash.2d at 248, 787 P.2d 545.
[8] Likewise, given our disposition of this case we deem it unnecessary at this time to address the preclusion issue decided by the trial court in Grace/Chrysler. Our review of this issue is specifically reserved however, should further review be required. See Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 277, 104 S.Ct. 3049, 3058, 82 L.Ed.2d 200 (1984) (noting remand to state courts for further proceedings is appropriate where "the federal constitutional issues involved may well be intertwined with, or their consideration obviated by, issues of state law"); Fulton Corp. v. Faulkner, 516 U.S. 325, 347, 116 S.Ct. 848, 862, 133 L.Ed.2d 796 (1996) (citing Bacchus, remanding for determination of whether taxpayer complied with state law procedural requirements); James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 544, 111 S.Ct. 2439, 2448, 115 L.Ed.2d 481 (1991) (remanding for further proceedings, citing Bacchus, holding that the Court's ruling, requiring a rule of law be applied equally to all litigants who are not barred by procedural requirements or res judicata, did not deprive respondents of their opportunity to raise procedural bars to recovery under state law).
[9] See State v. Gentry, 125 Wash.2d 570, 587 n. 12, 888 P.2d 1105 (writing justice whose dissenting views in prior case were not accepted by majority of the court was bound by doctrine of stare decisis to accede to the view of the majority on that issue in subsequent case), cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995).
[10] The "void ab initio" doctrine upon which taxpayers rely, as expressed in Norton, has been abandoned by the Supreme Court. See Lemon v. Kurtzman, 411 U.S. 192, 197-99, 93 S.Ct. 1463, 1468-69, 36 L.Ed.2d 151 (1973) (recognizing the abandonment of Norton); Ryan v. County of DuPage, 45 F.3d 1090, 1094 (7th Cir.1995) (same).
[11] Walter Hellerstein et al., Commerce Clause Restraints on State Taxation After Jefferson Lines, 51 Tax L.Rev. 47 (1995).
[12] At oral argument, taxpayers asserted that Reich, Newsweek and Dryden v. Madison County, ___ U.S. ___, 118 S.Ct. 1162, 140 L.Ed.2d 173 (1998), an opinion which vacated a Florida Supreme Court decision and remanded in light of Newsweek, are dispositive of this case, suggesting the Supreme Court has retreated from the approach it announced in McKesson. However, none of these cases addresses a credit provision analogous to this case. Furthermore, these cases, read together with Lohman and Reynoldsville Casket, do not indicate the Supreme Court has either abandoned the "flexibility" it enunciated in McKesson, nor reversed itself regarding the credits it stated in Tyler Pipe would cure the defect in Washington's B & O tax.
[13] With the exception of Newsweek and Dryden, our determination in Digital postdates the authority relied upon by taxpayers. In Digital, as in our other post-Tyler Pipe cases, we continue to rely and build upon the pronouncements of the Supreme Court in Tyler Pipe (see n. 12 above). Absent a clear directive from that Court to do otherwise, we will continue to rely on the roadmap provided to us in Tyler Pipe. Thus, Digital is dispositive of taxpayers' due process challenge.
[1] "[T]here is much more than a formal link between the federalism-based idea of shielding persons from the parochial forces of localism and the broader notion of protecting individuals against unfair and oppressive action by the state." Laurence H. Tribe, American Constitutional Law 402 (2d ed.1988) (footnote omitted).
[2] Laws of 1987, 2d Ex.Sess., ch. 3, partially codified at RCW 82.04.440.
[3] RCW 82.04.4286:

DeductionsNontaxable business. In computing tax there may be deducted from the measure of tax amounts derived from business which the state is prohibited from taxing under the Constitution of this state or the Constitution or laws of the United States.
[4] RCW 82.32.150:

Contest of taxPrepayment requiredRestraining orders and injunctions barred. All
taxes, penalties, and interest shall be paid in full before any action may be instituted in any court to contest all or any part of such taxes, penalties, or interest. No restraining order or injunction shall be granted or issued by any court or judge to restrain or enjoin the collection of any tax or penalty or any part thereof, except upon the ground that the assessment thereof was in violation of the Constitution of the United States or that of the state.
[5] RCW 82.32.060:

Excess payment of tax, penalty, or interest Credit or refundPayment of judgments for refund. (1) If, upon receipt of an application by a taxpayer for a refund or for an audit of the taxpayer's records, or upon an examination of the returns or records of any taxpayer, it is determined by the department that within the statutory period for assessment of taxes, penalties, or interest prescribed by RCW 82.32.050 any amount of tax, penalty, or interest has been paid in excess of that properly due, the excess amount paid within, or attributable to, such period shall be credited to the taxpayer's account or shall be refunded to the taxpayer, at the taxpayer's option. Except as provided in subsections (2) and (3) of this section, no refund or credit shall be made for taxes, penalties, or interest paid more than four years prior to the beginning of the calendar year in which the refund application is made or examination of records is completed.
(2) The execution of a written waiver under RCW 82.32.050 or 82.32.100 shall extend the time for making a refund or credit of any taxes paid during, or attributable to, the years covered by the waiver if, prior to the expiration of the waiver period, an application for refund of such taxes is made by the taxpayer or the department discovers a refund or credit is due.
(3) Notwithstanding the foregoing limitations there shall be refunded or credited to taxpayers engaged in the performance of United States government contracts or subcontracts the amount of any tax paid, measured by that portion of the amounts received from the United States, which the taxpayer is required by contract or applicable federal statute to refund or credit to the United States, if claim for such refund is filed by the taxpayer with the department within one year of the date that the amount of the refund or credit due to the United States is finally determined and filed within four years of the date on which the tax was paid: PROVIDED, That no interest shall be allowed on such refund.
(4) Any such refunds shall be made by means of vouchers approved by the department and by the issuance of state warrants drawn upon and payable from such funds as the legislature may provide. However, taxpayers who are required to pay taxes by electronic funds transfer under RCW 82.32.080 shall have any refunds paid by electronic funds transfer.
(5) Any judgment for which a recovery is granted by any court of competent jurisdiction, not appealed from, for tax, penalties, and interest which were paid by the taxpayer, and costs, in a suit by any taxpayer shall be paid in the same manner, as provided in subsection (4) of this section, upon the filing with the department of a certified copy of the order or judgment of the court.
(a) Interest at the rate of three percent per annum shall be allowed by the department and by any court on the amount of any refund, credit, or other recovery allowed to a taxpayer for taxes, penalties, or interest paid by the taxpayer before January 1, 1992. This rate of interest shall apply for all interest allowed through December 31, 1998. Interest allowed after December 31, 1998, shall be computed at the rate as computed under RCW 82.32.050(2). The rate so computed shall be adjusted on the first day of January of each year for use in computing interest for that calendar year.
(b) For refunds or credits of amounts paid or other recovery allowed to a taxpayer after December 31, 1991, the rate of interest shall be the rate as computed for assessments under RCW 82.32.050(2). The rate so computed shall be adjusted on the first day of January of each year for use in computing interest for that calendar year.
[6] "In taxation, credits reduce the tax liability as computed, as opposed to deductions which reduce the taxable income. Examples of tax credits include: credit for child and dependent care expenses, credit for the elderly or permanently disabled, etc." Black's Law Dictionary 367 (6th ed.1990).
[7] See also Digital Equip. Corp. v. Department of Revenue, 129 Wash.2d 177, 188, 916 P.2d 933 (1996), cert. denied, 520 U.S. 1273, 117 S.Ct. 2452, 138 L.Ed.2d 210 (1997). Moreover I concur specifically with the majority's view that Tyler Pipe applies retroactively as "[p]rospective decisionmaking is the handmaid of judicial activism, and the born enemy of stare decisis," Harper v. Department of Taxation, 509 U.S. 86, 105, 113 S.Ct. 2510, 2522, 125 L.Ed.2d 74 (1993) (Scalia, J., concurring), as "[constitutional] meaning is changeless; it is only [its] application which is extensible." Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 451, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481 (1934) (Sutherland, J., dissenting).
[8] The majority's concern is properly evaluated under the Supreme Court's retroactivity analysis  a concern which is satisfied when the case is held, as it was here, to have retroactive effect. But the majority goes further, appearing to conclude that the principle that an unconstitutional law is void has been, sub silentio, overturned by the Supreme Court in Lemon v. Kurtzman, 411 U.S. 192, 197-99, 93 S.Ct. 1463, 1468-69, 36 L.Ed.2d 151 (1973). Majority at 1017 n. 10. But Lemon stands for something quite different. As the Supreme Court explained, courts must recognize that statutes and judge-made rules of law are facts upon which people rely when making decisions. Lemon, 411 U.S. at 198-99, 93 S.Ct. 1463. Therefore a judicial holding that a statute is unconstitutional is subject to "`no set "principle of absolute retroactive invalidity"....'" Id. (quoting Linkletter v. Walker, 381 U.S. 618, 627, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)). Rather, the court must reconcile the constitutional interests and reliance interests when determining whether the rule of the case shall be retroactively applied to fashion an appropriate equitable remedy. Lemon, 411 U.S. at 198-99, 93 S.Ct. 1463. We completed this process when we finally determined in 1996 that the Supreme Court's decision in Tyler Pipe nullifying our previous B & O tax would be applied retroactively. Digital Equip. Corp., 129 Wash.2d at 188, 916 P.2d 933 (Smith, J., majority opinion); id. at 195, 916 P.2d 933 (Durham, C.J., concurring). As we have already determined that the Supreme Court's decision in Tyler Pipe applies retroactively, Lemon's concerns have been satisfied and do not support the majority's conclusion that one deprived of his constitutional rights may also be robbed not only of his remedy but also his defense to future deprivations.
[9] "We have already decided this issue [retroactive application of tax credit amendments] as well." Majority at 1021. "Section 3 of the [1987 act] shows that the Legislature intended to apply relief retroactively in the event of a court-ordered remedy notwithstanding the effective date of the act." American Nat'l Can Corp. v. Department of Revenue, 114 Wash.2d 236, 250, 787 P.2d 545 (1990) (emphasis added). "[S]ection 3 of the 1987 session laws applies the law to tax periods prior to June 23, 1987." Digital Equip. Corp., 129 Wash.2d at 193, 916 P.2d 933.
[10] Sec. 5. This act is necessary for the immediate preservation of the public peace, health, and safety, the support of the state government and its existing public institutions, and shall take effect immediately.

Passed the Senate August 10, 1987. Passed the House August 10, 1987. Approved by the Governor August 11, 1987.
Filed in Office of Secretary of State August 11, 1987.
Laws of 1987, 2d Ex.Sess., ch. 3, § 5.
[11] Where the legislature has clearly stated that the statute in question is to be applied retroactively, courts will so enforce it. Landgraf v. USI Film Prods., 511 U.S. 244, 268, 114 S.Ct. 1483, 1498, 128 L.Ed.2d 229 (1994); State v. Douty, 92 Wash.2d 930, 935, 603 P.2d 373 (1979). The United States Supreme Court has, for example, upheld the retroactive effective date of tax legislation where the legislative command has been explicit. See, e.g., United States v. Carlton, 512 U.S. 26, 38-39, 114 S.Ct. 2018, 2026, 129 L.Ed.2d 22 (1994); United States v. Darusmont, 449 U.S. 292, 294-95, 101 S.Ct. 549, 551, 66 L.Ed.2d 513 (1981) (per curiam); Welch v. Henry, 305 U.S. 134, 141-12, 151, 59 S.Ct. 121, 123, 83 L.Ed. 87, 118 A.L.R. 1142 (1938). Typically retroactive statutes expressly identify the prior effective date. For example, the statute at issue in Carlton stated that the amendments "shall take effect as if included in the amendments made by section 1172 of the Tax Reform Act of 1986." Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100-203, § 10411(b), 101 Stat. 1330-433. The statute under consideration in Darusmont read "the amendments made by this section shall apply to items of tax preference for taxable years beginning after December 31, 1975." Tax Reform Act of 1976, Pub.L. No. 94-455, § 301(g)(1), 90 Stat. 1553. In Welch the state statute at issue read, "`Dividends' shall mean all dividends derived from stocks ... received in the calendar year 1933..." 1935 Wis. Laws ch. 15, § 6(1)(b).

Our legislature showed its understanding of this rule when it last amended the B & O tax. "Except as otherwise provided in section 6 of this act, section 4 of this act applies retrospectively to all tax reporting periods on or after June 23, 1987." Laws of 1994, ch. 124, § 7 (emphasis added). Section 6 of the Laws of 1994, chapter 124, is, in fact, the very language we are considering. Laws of 1994, ch. 124, § 6. Section 4 is the substantive change to the B & O tax. Laws of 1994, ch. 124, § 4. That is, in 1994, the Legislature explicitly made the 1987 amendments to the B & O tax retroactive to June 23, 1987, the date on which the Supreme Court invalidated Washington's previous B & O tax, and no earlier.
[12] Absent an explicit command otherwise, a court will apply a statute prospectively only. Landgraf, 511 U.S. at 270, 114 S.Ct. 1483 ("Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent.") (citations omitted); State v. Douty, 92 Wash.2d 930, 935, 603 P.2d 373 (1979) ("It is a general rule ... that a statute will be construed as prospective unless its language requires a contrary construction.").

This rule reflects the fact that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." Landgraf, 511 U.S. at 265, 114 S.Ct. 1483. While retroactive legislation is not unconstitutional per se, the presumption that it is finds manifestation in several federal constitutional provisions, such as the Ex Post Facto Clause, Const, art. I, § 9, cl. 3, and art. I, § 10, cl. 1, and the prohibition on laws impairing contracts, art. I, § 10, cl. 1. See Landgraf, 511 U.S. at 266, 114 S.Ct. 1483. The antipathy to retroactive legislation is further reflected in the Fifth Amendment's prohibition on takings and the prohibitions on Bills of Attainder found in art. I, §§ 9-10. See Landgraf, 511 U.S. at 266, 114 S.Ct. 1483. See also 2 Joseph Story, Commentaries on the Constitution of the United States § 1398, at 272 (5th ed. 1891) (While except for ex post facto laws and laws impairing obligation of contracts retroactive statutes may still be passed by the states, they are nonetheless "generally unjust[] and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact.") (citation omitted); 1 James Kent, Commentaries on American Law, 454 (5th ed. 1844) (Retroactive laws are against every sound principle and the doctrine prohibiting them is based not only on English law but on "principles of general jurisprudence.") (citations omitted).
[13] In this regard the majority cites McKesson Corp. v. Division of Alcoholic Beverages & Tobacco, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) for the proposition that "the United States Supreme Court recognized where a State imposes an unconstitutional tax ... the state legislature may modify the offending statute retroactively to correct the constitutional defect." Majority at 1017. Although the Supreme Court recognized the possibility in McKesson ("Florida may reformulate and enforce the Liquor Tax during the contested tax period...." 496 U.S. at 40, 110 S.Ct. 2238), there was no retroactive legislation for the court to consider in McKesson. Neither is there any case analogous to our own, evidencing a legislative or judicial attempt to limit the remedy for prior tax periods, which has found favor in Supreme Court jurisprudence. See section III, infra. Moreover, the Supreme Court cautioned that even truly retroactive impositions of tax liability "beyond some temporal point" may offend due process. McKesson, 496 U.S. at 40 n. 23, 110 S.Ct. 2238.
[14] The majority's entire analysis on the application of the 1987 MATC, Majority at 1019-1022, is predicated on the presumption that the 1987 act has been given retroactive effect at all times prior to its passage.
[15] See Sheldon H. Jaffe, What a Long Strange Trip It's Been: Court-Created Limitations on Rights of Action for Negligently Furnishing Alcohol, 72 Wash. L.Rev. 595, 608 (1997) (conflicting holdings are entitled to less precedential authority as they do not live up to principle of predictability that is at core of doctrine of stare decisis).
[16] "Either a repeal of the manufacturing tax or an expansion of the multiple activities exemption to provide out-of-state manufacturers with a credit for manufacturing taxes paid to other States would presumably cure the discrimination." Tyler Pipe, 483 U.S. at 249, 107 S.Ct. 2810. See also National Can II, 109 Wash.2d at 889, 749 P.2d 1286 (describing tax credit suggestion by United States Supreme Court as "dicta").
[17] See also Holt, C.J., in Ashby v. White, 2 Ld. Raym. 938, 92 Eng. Rep. 126 (1703) ("it is a vain thing to imagine a right without a remedy; for want of right and want of remedy are reciprocal"); and see Willcox v. Penn Mut. Life Ins. Co., 357 Pa. 581, 600, 55 A.2d 521, 530-31, 174 A.L.R. 220 (1947) ("Not only is the maxim `ubi jus ibi remedium'where there is a right there is a remedyone of the proudest declarations of the common law, but it necessarily implies that a right without a remedy is not a right at all but a mere abstraction.").
[18] It is true that we upheld tax credits as an excuse for postdeprivation relief subsequent to Reich. Digital Equip. Corp., 129 Wash.2d at 194-95, 916 P.2d 933. However, we did so without considering the implications of the Supreme Court's disapproval of an analogous "bait and switch" approach.
[19] M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579 (1819); cf. Tribe, supra, at 404, 444.
[20] "The business activity subject to tax, and against which credit(s) is claimed, must involve the same ingredients or product upon which the tax giving rise to the credit(s) was paid. The credits must be product-specific." WAC 458-20-19301(4)(d). WAC 458-20-19301(9) provides:

"Recordkeeping requirements. Persons claiming the MATC must keep and preserve such records and documents as may be necessary to prove their entitlement to any credits taken under this system (RCW 82.32.070). It is not required to submit copies of such proofs when credits are claimed or together with the Schedule C detail. Rather, such records must be kept for a period no less than five years from the date of the tax return upon which the related tax credits are claimed. Such records are fully subject to audit for confirmation of the validity and amounts of credits taken. Records which must be preserved by persons claiming external tax credits include:
"(a) Copies of sales contracts, or other written or memorialized evidence of any sales agreements, including purchase and billing invoices showing the origin state and destination state of products sold.
"(b) Copies of shipping or other delivery documents identifying the products sold and delivered, reconcilable with the selling documents of subsection (a) above, if appropriate.
"(c) Copies of production reports, transfer orders, and similar such documents which will reflect the intercompany or interdepartmental movement of extracted ingredients or manufactured products where no sale has occurred.
"(d) Copies of tax returns or reports filed with other states' taxing authorities showing the kinds and amounts of taxes paid to such other states for which MATC is claimed.
"(e) Copies of canceled checks or other proofs of actual tax payment to the other state(s) giving rise to the MATC claimed.
"(f) Copies of any other state(s) taxing statutes, laws, ordinances, and other appropriate legal authorities necessary to establish the nature of the other states' tax as a gross receipts tax, as defined in this section.
"(g) Failure to keep and preserve proofs of entitlement to the MATC will result in the denial of credits claimed and the assessment of all taxes offset or reduced by such credits as well as the additional assessment of interest and penalties as required by law. (See RCW 82.32.050.)."
[21] W.R. Grace's manager of state and local taxes explained that Grace had not kept the extensive records mandated by the WAC because it was not required to do so prior to the effective date of the 1987 act and the WAC regulations applicable to it. Clerk's Papers (CP) (Grace) at 924-25. In the same manner Chrysler, according to its Chief Tax Counsel John L. Loffredo, also failed to keep these records as they were under no obligation to do so. CP (Chrysler) at 541-42. As an example of the injustice perpetrated by our application of the WAC regulations, consider the case of W.R. Grace which has "sold at least five of the divisions against which Washington tax has been assessed, does not have their records, and does not have the employees who are knowledgeable about their activities during the period 1980 through 1989." CP (Grace) at 925.
[22] For example, according to the Department of Revenue the total external (i.e., interstate) credits for 1988-1989 were $1 million. CP (Grace) at 163. Yet, state estimates showed a total wholesale B & O tax to be paid by out-of-state manufacturers in the 1987-1989 biennium of $150 million. CP (Grace) at 303. Department of Revenue figures show total external credits for 1988 through 1993 of $5.7 million vs. internal credits of $670.30 million. CP (Grace) at 176.
[23] Tyler Pipe, 483 U.S. at 242, 107 S.Ct. 2810.
[24] Tribe, supra, at 465 (footnote omitted); see also Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421, 67 A.L.R.2d 1292 (1959).
[25] Since American Nat'l Can, we have, in passing, mentioned that the B & O tax as amended in 1987 "meets constitutional requirements." Digital Equip. Corp., 129 Wash.2d at 182 n. 8, 916 P.2d 933. However, we made that statement in reliance solely upon American Nat'l Can, 114 Wash.2d 236, 787 P.2d 545, a case where the taxpayer had conceded that the tax was fairly apportioned. Id. at 248, 787 P.2d 545. The taxpayer in Digital also conceded that it was not necessarily entitled to a refund. Digital Equip. Corp., 129 Wash.2d at 189, 916 P.2d 933. Finally, the Digital court expressed its opinion on the constitutionality of Washington's B & O tax although that was not an issue before it. Id. at 182 n. 8, 916 P.2d 933. In fact we commented, "[o]ur consideration of the principal issues in this case became acutely academic when counsel for Digital during oral argument conceded that Digital had not been `double taxed' and consequently suffered no injury under the former unconstitutional tax scheme." Id. at 192, 916 P.2d 933. Resulting dicta on apportionment is therefore not precedential. See, e.g., Peterson v. Hagan, 56 Wash.2d 48, 53, 351 P.2d 127 (1960) (noting general expressions in opinion confined to facts before court and limited to case decided and points actually involved).
[26] "Lying back of these decisions is the recognized danger that, to the extent that the burden falls on economic interests without the state, it is not likely to be alleviated by those political restraints which are normally exerted on legislation where it affects adversely interests within the state." McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 45-46 n. 2, 60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876 (1940).
[27] Cf. Tribe, supra, at 441-42.
[28] The Supreme Court declined to discuss the apportionment challenge mounted by local manufacturers who sell interstate, Tyler, 483 U.S. at 248 n. 16, 107 S.Ct. 2810; however, it noted "the activity of wholesalingwhether by an in-state or an out-of-state manufacturermust be viewed as a separate activity conducted wholly within Washington that no other State has jurisdiction to tax." Tyler Pipe, 483 U.S. at 251, 107 S.Ct. 2810 (citing Moorman Mfg. Co. v. Bair, 437 U.S. 267, 280-81, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978) and Standard Pressed Steel Co. v. State Dep't of Revenue, 419 U.S. 560, 564, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975)). This wholly intrastate analysis is what makes sales and use taxes acceptable under the dormant commerce clause. See Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 188-90, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995). If, however, the activity taxed is not truly exclusively intrastate, then the tax must be apportioned. Id. Tribe also discounts the apportionment discussion in Tyler Pipe, observing that the court then "had no occasion to question [General Motors Corp. v. Washington, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964), overruled by Tyler Pipe Ind., Inc. v. Department of Revenue, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987)] ... conclusions with respect to nexus and fair apportionment. Id. at 2820 n. 16, 107 S.Ct. 2810." Tribe, supra, at 464 n. 21.

The two cases cited by the Supreme Court in Tyler Pipe during its discussion of apportionment provide some enlightenment. Standard Pressed Steel states that the taxpayer challenging the lack of apportionment of a B & O tax, as applied, must show risk of multiple taxation. Standard Pressed Steel, 419 U.S. at 563-64, 95 S.Ct. 706. But here the risk of multiple taxation is amply demonstrated. See supra section IV. Moorman, in turn, merely notes that the holding in Standard Pressed Steel found that a tax on the entire gross receipts from sales made in Washington were properly apportioned. Moorman, 437 U.S. at 280-81, 98 S.Ct. 2340.
[29] The majority relies upon our earlier reading of Tyler Pipe. Majority at 1019 (quoting American Nat'l Can, 114 Wash.2d at 248, 787 P.2d 545 (citing Tyler Pipe, 483 U.S. at 253, 107 S.Ct. 2810)). American National Can, in turn, did no analysis of the question of apportionment, but relied on citations to earlier cases. American Nat'l Can, 114 Wash.2d at 248, 787 P.2d 545 (citing Department of Revenue v. Association of Wash. Stevedoring Cos., 435 U.S. 734, 750, 98 S.Ct. 1388, 1399, 55 L.Ed.2d 682 (1978); Standard Pressed Steel Co. v. Department of Revenue, 419 U.S. 560, 564, 95 S.Ct. 706, 709, 42 L.Ed.2d 719 (1975); Chicago Bridge & Iron Co. v. Department of Revenue, 98 Wash.2d 814, 826-30, 659 P.2d 463 (1983)).

These cited cases, in turn, do not offer the support required. First and foremost, they predated the Supreme Court's recent clarification, in Jefferson Lines, on the distinction between sales taxes and gross receipt taxes. Standard Pressed Steel is very limited. See supra n. 28. The holding in Association of Wash. Stevedoring Cos., like that in Standard Pressed Steel, is predicated on the failure of the respondents to show how the lack of apportionment discriminated against interstate business. Association of Wash. Stevedoring Cos., 435 U.S. at 750, 98 S.Ct. 1388. The Court in Association of Wash. Stevedoring Cos. also relied upon an analysis that likened the activity taxed to in-state sales. Id. Finally, Chicago Bridge & Iron Co. applied a sales analysis. 98 Wash.2d at 830, 659 P.2d 463.
[30] Tyler Pipe Indus., Inc. v. Department of Revenue, 105 Wash.2d 318, 326, 715 P.2d 123 (1986), judgment vacated by 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987); National Can Corp. v. Department of Revenue, 105 Wash.2d 327, 340-41, 732 P.2d 134 (1986) (National Can I), judgment vacated by Tyler Pipe, 483 U.S. 232, 107 S.Ct. 2810; American Nat'l Can, 114 Wash.2d at 248, 787 P.2d 545. These cases all predated Jefferson Lines. They also relied upon Association of Wash. Stevedoring Cos., Moorman Mfg., Standard Pressed Steel, and Chicago Bridge & Iron Co., all cases which offer less than stellar support for the fair apportionment of Washington's B & O tax for reasons given supra at notes 28 and 29.
[31] Our holding that the B & O tax was fairly apportioned in National Can I was based on our conclusion that this was a tax upon "the privilege of manufacturing or selling within the state" in the sense that minimal nexus requirements were satisfied. However, nexus does not satisfy a requirement for apportionment. National Can I, 105 Wash.2d at 341, 732 P.2d 134.
[32] Internal consistency exists when the imposition of an identical tax by every state in the Union would add no burden to interstate commerce that intrastate burden would not place interstate commerce at a disadvantage to intrastate commerce. Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331. See also American Trucking Ass'n v. Scheiner, 483 U.S. 266, 284, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987) ("To pass the `internal consistency' test, a state tax must be of a kind that, `if applied by every jurisdiction, there would be no impermissible interference with free trade.'") (quoting Armco Inc. v. Hardesty, 467 U.S. 638, 644, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984)).